IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KEVIN MCBRIDE,                          )
                                        )
            Plaintiff,                   )
                                        )
    v.                                  )       Case No.:
                                        )       04-03307-CV-S-REL
DEPUTY KIM CLARK, et al.,               )
                                        )
            Defendants.                  )

## ORDER GRANTING DEFENDANT KIM CLARK'S
## MOTION FOR SUMMARY JUDGMENT

Before the court is Defendant Kim Clark's motion for summary judgment on the

grounds that (1) her actions do not constitute excessive force, but if they do she is entitled

to qualified immunity, and that (2) she is entitled to official immunity on Plaintiff's state

law battery claim.  I find that (1) Defendant's use of a taser does not constitute excessive

force and (2) Defendant is entitled to official immunity in her individual capacity.

Therefore, Defendant's motion for summary judgment will be granted on these grounds.

## I.    BACKGROUND

On July 30, 2004, Plaintiff filed a two-count complaint against: Defendant

Christian County, Missouri, by and through its Board of County Commissioners in their

official capacities ("Christian County"); Defendant Joey Matlock,[1] Sheriff of Christian

County, Missouri, in his official capacity; Defendant Deputy Kim Clark, personally and

_____

[1]On January 23, 2006, Christian County's new sheriff, Mike Robertson, was
substituted in place of former Sheriff Joey Matlock (Doc. # 46).

in her official capacity; and other unknown deputy sheriffs acting as jailers. Count I of the complaint alleges that he was subjected to excessive force when Defendant deployed a taser on his neck while he was restrained in a restraint chair. Count II is a state law battery claim for such use of the taser.

On December 16, 2005, Defendant filed a motion for summary judgment and suggestions in support (Doc. ## 38, 39). Plaintiff filed a response in opposition on January 18, 2006 (Doc. # 44). On January 31, 2006, Defendant filed a reply to Plaintiff's response (Doc. # 52). On February 27, 2006, Plaintiff filed a sur-reply solely to respond to the new averments contained in Defendant's reply (Doc. # 71).

## II.     STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. Am. Acad. of Family Physicians v. United States, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), aff'd 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of

proving that these requirements for summary judgment have been met. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. Disesa v. St. Louis Cmty. Coll., 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. Anderson, 477 U.S. at 248. Factual disputes that are collateral to the substantive law will not preclude summary judgment. Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Id. at 249. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Id. at 255. If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted. Id. at 249-50.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. Id. at 323. If the moving party meets the requirement,

3

the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248. The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

## III.    UNCONTROVERTED FACTS

Below, typed in bold, are the facts offered by Defendant that I find to be uncontroverted by the record before me.

1.    **Plaintiff was held at the Christian County Jail beginning on or about June 18, 2003, through June 19, 2003 for suspicion of a drug-related offense.**

Plaintiff does not dispute this fact.

2.    **Plaintiff used methamphetamines every two days or so during the two months leading up to the date of the detainment, June 18, 2003.**

Plaintiff does not dispute this fact.

3.    **Plaintiff used methamphetamines on June 17, 2003, one day prior to the beginning of his detainment in the Christian County Jail.**

Plaintiff does not dispute this fact.

4.    **Kim Clark used a taser on plaintiff while he was incarcerated in the Christian County Jail on June 19, 2003.**

Plaintiff does not dispute this fact.

5.    **Defendant Kim Clark was employed with the Christian County**

4

**Sheriff's Department in June of 2003.**

Plaintiff does not dispute this fact.

6.  **Defendant Kim Clark received over 600 hours academy training prior to her employment with the Christian County Sheriff's Department.[2]**

Plaintiff does not dispute this fact.

7.  **Defendant Kim Clark received training on the appropriate use of tasers prior to June 18, 2003 during her employment with the Christian County Sheriff's Department.**

Plaintiff does not dispute this fact.

8.  **Defendant Kim Clark was certified in the use of tasers when she used one on plaintiff.**

Plaintiff does not dispute this fact.

9.  **Kim Clark received training on appropriate use of force, prior to**

---

[2]Defendant did not include Kim Clark's Answers to Interrogatories in her attached exhibits. However, because it is apparent what document she is referring to, because her interrogatories are included in the exhibits submitted by co-defendants Christian County and Sheriff Robertson, and because Plaintiff does not dispute this fact, I will treat this fact as supported by the record.

5

**June 18, 200[3]**[3]**, during her employment with the Christian County Sheriff's Department.**

Plaintiff does not dispute this fact.

10. **Plaintiff was yelling and screaming when he was in the Christian County Jail.**

Plaintiff does not dispute this fact.

11. **Plaintiff was yelling vulgarities and *"F U's"* in the jail**.

Plaintiff does not dispute this fact.

12. **Plaintiff's yelling and screaming was disrupting and upsetting other inmates in the jail, including plaintiff's girlfriend, Holly Lockard.**

Plaintiff does not dispute this fact.

13. **Plaintiff was yelling and screaming back and forth with another inmate in the jail, Holly Lockard.**

Plaintiff does not dispute this fact.

14. **Plaintiff's screaming was interfering with Kim Clark's ability to**

---

[3]Defendant's Uncontroverted Fact No. 9 actually reads, "Kim Clark received training on appropriate use of force, prior to June 18, *2005*, during her employment with the Christian County Sheriff's Department." (emphasis added). I note that the year "2005" is a typographical error, as the interrogatory and previous questions refer to the date in question as being June 18, 2003.

In addition, I also note that Defendant did not include Kim Clark's Answers to Interrogatories in her attached exhibits. However, because it is apparent what document she is referring to, because her interrogatories are included in the exhibits submitted simultaneously by co-defendants Christian County and Sheriff Robertson, and because Plaintiff does not dispute this fact, I will treat this fact as supported by the record.

6

**perform her job duties.**

Plaintiff does not dispute this fact.

15. **Holly Lockard was also under the influence of narcotics while she was in the jail.**

Plaintiff does not dispute this fact.

16. **Holly Lockard was screaming back and forth with plaintiff, Kevin McBride.**

Plaintiff does not dispute this fact.

17. **Kim Clark called the nurse to do a medical assessment on plaintiff.**

Plaintiff does not dispute this fact.

18. **Holly Lockard was in the restraint chair that the nurse needed for plaintiff, so she was placed in the safety cell in order for the restraint chair to be used for plaintiff.**

Plaintiff does not dispute this fact.

19. **Holly Lockard then undressed and stood in front of the cell door naked.**

Plaintiff does not dispute this fact.

20. **Holly Lockard then placed her hands inside her genital area and began to write on the walls in her menstrual blood.**

Plaintiff does not dispute this fact.

21. **Holly Lockard's conduct continued as plaintiff continued to scream.**

Plaintiff does not dispute this fact.

22.    **Holly Lockard's conduct presented significant control and safety issues.**

Plaintiff does not dispute this fact.

23.    **Plaintiff was placed in a safety suit during his detainment in the jail.**

Plaintiff does not dispute this fact.

24.    **Once plaintiff was in the safety suit, he was placed in the safety cell which has padded doors and walls.**

Plaintiff does not dispute this fact.

25.    **While plaintiff was in the safety cell, he bit at the straps on his safety suit until he was successful in removing it.**

Plaintiff does not dispute this fact.

26.    **Plaintiff's chewing on the straps which restrained him was interpreted by Officer Clark as an escape attempt.**

Plaintiff does not dispute this fact.

27.    **After plaintiff removed his suicide suit, he was naked.**

Plaintiff does not dispute this fact.

28.    **Plaintiff had to be instructed to place the suit on again.**

Plaintiff does not dispute this fact.

29.    **When the nurse arrived, he asked Kim Clark to place plaintiff in the**

8

restraint chair so that he could evaluate plaintiff medically.

> Plaintiff does not dispute this fact.

30. **The Nurse administered an IV to plaintiff for medical treatment, which he was trying to pop out of his hand.**

> Plaintiff does not dispute this fact.

31. **Prior to use of the taser by Kim Clark, plaintiff had applied pressure on the straps of the restraint chair and popped out his IV.**

> Plaintiff does not dispute this fact.

32. **Popping out his IV caused plaintiff to bleed on the restraint chair.**

> Plaintiff does not dispute this fact.

33. **Plaintiff informed Officer Clark, prior to the taser being applied to him, that he had Hepatitis C.**

> Plaintiff does not dispute this fact.

34. **Plaintiff refused Kim Clark's verbal orders to cease screaming and yelling and to cease attempting to pop out his IV.**

> Plaintiff does not dispute this fact.

35. **Plaintiff's expert agrees that it is proper to use a taser to gain inmate compliance with a command.**

> Plaintiff does not dispute this fact.

36. **Plaintiff's expert, Bucky Smith, agrees that conduct which aggravates other inmates needs to be brought under control.**

9

Plaintiff does not dispute this fact.

37. **Kim Clark deployed the taser for plaintiff's safety, officer safety due to fear of the spread of plaintiff's communicable disease(s), and to maintain control of the jail population and gain plaintiff's compliance with verbal commands.**

Plaintiff does not dispute this fact.

38. **The taser only left small read marks on plaintiff's neck and did not cause bleeding.**

Plaintiff does not dispute this fact.

## IV. *ADDITIONAL UNCONTROVERTED FACTS*

In his response, Plaintiff offered additional uncontroverted facts. Below, the facts typed in bold are those that I find to be undisputed based on the admissible evidence before me.

1. **Plaintiff was held at the Christian County Jail beginning on or about June 18, 2003, through June 19, 2003, on a warrant, and was held in the Christian County Jail as a pretrial detainee for the Taney County Sheriff's Department.**

Defendant does not dispute this fact.

2. **Plaintiff was strapped into a restraint chair while incarcerated in the Christian County Jail.**

Defendant does not dispute this fact.

**Defendant further avers that plaintiff was placed in the restraint chair due to his erratic, violent, and suicidal behavior.**

10

Plaintiff disputes this fact.

In support of this fact, Defendant cites the Christian County Sheriff's Department Jail Incident Report complete by Deputy Clark ("Incident Report"). The relevant portion of the report describing Plaintiff's behavior after he was placed in the restraint chair is as follows:

> At approximately 2350 hrs., Cpl. Kembel placed Inmate McBride into the shower room to shower before housing him. Inmate McBride began to yell, stating, "I'm not going to shower. I'm cold." Inmate McBride stated that he would not shower until he received a towel. Cpl. Kembel and I explained to Inmate McBride that he would receive a towel after he had completed his shower. Inmate McBride then started yelling "you nigger lover; cocksuckers. I'm going to yell until I get my towel, you pig bastards." Inmate McBride then banged his head on the shower door. When Inmate McBride was instructed to shower again, he said that he was going to "kill myself" while in the shower. Inmate McBride said that he was going to bang his head on the wall until he got what he wanted. We then talked Inmate McBride into showering.
>
> After the shower, Inmate McBride began to yell again. He made statements such as, "Fuck you all, you fat bastards. I'm going to yell until I get a towel." Cpl Kembel gave Inmate McBride a towel and then attempted to give Inmate McBride a safety suit. Inmate McBride threw it back and stated that he wasn't going to wear "that shit". Cpl. Kembel stated that Inmate McBride could refuse the suit, but Inmate McBride would be naked if he did. Inmate McBride then began to cry. Inmate McBride said that he "didn't want to be a problem" and put the suit on. Inmate McBride was then escorted to cell 71. When Inmate McBride reached the door to cell 71, he stiffened and refused to enter the cell. Inmate McBride stated that he wasn't going to go into that cell. Inmate McBride commented that he wanted a cell with a bed and a blanket. Inmate McBride turned to face Cpl. Kembel and I. Inmate McBride clenched his fist, tipped his head down, squinted his eyes, and began to take short shallow breaths which in my experience is the demeanor a person takes when getting ready to fight someone. Cpl. Kembel and I both placed the palm of our right hands on Inmate McBride's chest and gave him a push which made Inmate McBride take three steps backward into

11

the cell. Inmate McBride did not fall as a result of the push and was still standing. Inmate McBride was approx. 4' into cell 71 which allowed us to close the door safely.

Once in cell 71, Inmate McBride began yelling and banging his head on the walls. Inmate McBride would yell, "you nigger loving bastards. You cocksuckers. You pig, bastards. You wait 'til I see you on the streets someday. You can't do this. I'm going to call my lawyer and sue you." Inmate McBride would then begin to cry and say, "Help me. Somebody help me. I just want help. I don't want to be here. I don't want to be like this.". [sic] During this time, Inmate McBride took the safety suit off and stood naked at the door to cell 71. Inmate McBride then contacted Control via the Intercom system, however Control had silenced the intercom due to the constant calling from Inmate Lockard, who had been in cell 71 approximately 10 minutes prior to Inmate McBride. I heard Inmate McBride state that Cpl. Kembel and I were trying to kill him. Inmate McBride also repeated the comments that he had made at booking that had [sic] been kidnapped [sic] and held captive in a cave in Arkansas for the last month. Then Inmate McBride stated that he and his girlfriend were together using drugs 1 week ago. Inmate McBride told us that he had not been feed [sic] for the last week, but he had used meth 4 days ago. Inmate McBride stated that people were trying to get him and that we were trying to help those people. Cpl Kembel asked Inmate McBride what people were trying to hurt him. Cpl Kembel also asked who had kidnapped [sic] him. Inmate McBride stated, "It's better if I don't say. They can get me in prison too." At this time Cpl. Kembel instructed me to contact Nurse Honeycutt for an evaluation of Inmate McBride. At approximately 2359, I contacted Nurse Honeycutt via his home phone and told him about Inmate McBride's comments and mood swings. Nurse Honeycutt stated that he would come to the detention center to evaluate Inmate McBride's mental state as soon as he could.

While waiting for Nurse Honeycutt's arrival, Inmate McBride continued to scream that he was going to bang his head on the walls and doors until we gave him a bed. Inmate McBride would yell, "you pig bastards are going to be sorry. I'm not going to stop until you give me what I want. You cunt. You fat bastards. You cocksucking fat bastards." Inmate McBride was still not wearing the safety suit and [was] naked. Inmate McBride was pacing about the cell. During the pacing, Inmate McBride stopped twice and banged his head against the padded wall of the cell. Inmate McBride would then stand in front of the window in the cell door and say to us, "Do

12

you like seeing my dick you cocksucking cunt? Why don't you come suck it, you fat bastards?" Inmate McBride would thrust his hips at us as he said this causing his penis to bounce on his body. Inmate McBride did this 4-5 times. I found this to be very offensive and sexually harassing. On the 5th time, Cpl Kembel and I opened the door to cell 71 and instructed Inmate McBride to place the safety suit back on as we did not want to see his penis out flopping around. Inmate McBride went to the back of the cell and put the suit on. While placing the suit back on, Inmate McBride began to cry and said, "why are you guys being so mean to me? Why do you want to hurt me? I'm trying to be good. Can't you see, I've done everything to be good? You just want to kill me." Cpl Kembel and I told Inmate McBride that we were not there to cause him harm. We explained to him that we were there to make sure he was safe and that he didn't try to harm himself. At that time I noticed Inmate McBride had a small cut to the left temple of his forehead. The cut appeared to be fresh as the blood was not coagulated and it had not been there at the time of booking. Inmate McBride placed the safety suit completely on and stood at the back of the cell. Once the safety suit was back on, Cpl Kembel and I shut the door and walked away.

After Cpl Kembel and I walked away, Inmate McBride began yelling, "you nigger loving bastards. You cocksuckers. You pig bastards. Do you hear me you pig bastards. [sic] I'm going to keep yelling and you can't do anything to stop me. I'm going to hit my head 'til I get what I want." Inmate McBride would do this while standing at the cell door. Cpl Kembel and I went to cell 71, but did not open the door. I had the Taser at that time, due to being short-handed on our crew and Inmate McBride's unstable state, I was concerned that harm may come to Cpl Kembel or myself. Cpl Kembel and I told Inmate McBride to sit down and relax. We explained to Inmate McBride that until the nurse cleared him to go to a cell, he was going to have to stay where he was. We told him that the nurse was on the way and would be here shortly. Inmate McBride refused to comply by continuing to yell "you nigger loving bastards. You cocksuckers. You pig bastards. What are you going to do?". After approximately 2-3 min. of attempting to reason with Inmate McBride, I instructed Control to open cell 71. When the door opened, Inmate McBride began to move to the back of the cell, then stopped and turned back toward the cell door to fact Cpl Kembel and myself. Inmate McBride began to cry again and say that we were going to kill him. I told Inmate McBride to move to the back of the cell and sit down. Inmate McBride against began to move to the back of the cell, then stopped and faced Cpl

13

Kembel and I again. Inmate McBride began to yell, "I don't care what you say. Just shoot me. I don't care." I again instructed Inmate McBride to sit down. Inmate McBride then clenched his fist and stated through clenched teeth "no, shoot me bitch". Inmate McBride then took a step toward Cpl Kembel and me. At that time, I deployed the Taser in an attempt to get Inmate McBride to comply to our instructions for his safety and ours. Only 1 prong made contact in the area of Inmate McBride's left thigh and did not penetrate the skin. The 2nd prong deflected off of the safety suit.

.   .   .

At approximately 0115 hrs., Nurse Honeycutt arrived and noticed Inmate McBride yelling. Nurse Honeycutt went immediately to cell 71. Nurse Honeycutt stated Inmate McBride was seated in the back of the cell banging his elbows and head against the wall. Inmate McBride noticed the nurse at the door and began to walk around the cell again. Nurse Honeycutt stated that he was unable to check Inmate McBride's vitals properly while in cell 71 due to Inmate McBride's increasing state of agitation. Nurse Honeycutt requested that we place Inmate McBride in the restraint chair in order to decrease his mobility and in an effort to calm Inmate McBride down. We first had to remove Inmate Lockard from the restraint chair, who was having withdrawals from PCP, meth, and cocaine. We removed Inmate Lockard from the restraint chair. Cpl Kembel brought the restraint chair to cell 71. I then radioed Control to open cell 71. Cpl Kembel instructed Inmate McBride to exit the cell and sit in the chair. Inmate Lockard was then rehoused in cell 71. Inmate McBride complied and began to ask, "Are you going to help me? I will do anything you want. I want to be off this stuff. I want to be clean." Cpl Kembel and I placed the wrist, waist, chest, and leg restraints on Inmate McBride. Inmate McBride continued to ask, "are you going to help me? I will do anything. I want to be off this stuff. I want to be clean. Thank you for helping me." Inmate McBride [w]as then wheeled over by cell 49. Nurse Honeycutt then began to do a medical evaluation of Inmate McBride.

While attempting to get the blood pressure cuff on Inmate McBride's left arm for the medical evaluation, Inmate McBride turned his head to the left attempting to bite the nurse. Inmate McBride also began to bite on the left chest strap of the restraint chair. Inmate McBride then began to try to spit on the nurse. Nurse Honeycutt told Inmate McBride to turn his head to the right and away from Nurse Honeycutt. Inmate McBride did not move his head or say anything. I then took my left hand and placed it on the left side of Inmate Honeycutt's [sic] face. I applied the amount of pressure

14

needed to turn Inmate McBride's head to the right to allow the nurse to safely complete his evaluation.

Nurse Honeycutt stated that Inmate McBride was under the influence of a narcotic. I believed the nurse to be correct due to Inmate McBride's previous statements, Inmate McBride's inability to not fidget for any period of time, and his severe mood swings. Nurse Honeycutt instructed Inmate McBride that he was going to start an IV to assist in reversing the affects [sic] of the drug. Inmate McBride was told that he would need to remain as still as possible during the placement of the IV needle. Nurse Honeycutt was telling Inmate McBride this while gathering the supplies he needed to administer the IV. At that time, Inmate McBride began to yell, saying "you're going to poison me. You don't know what you are doing." Inmate McBride accused Nurse Honeycutt, Cpl Kembel, and I of trying to force him to take more meth. Inmate McBride stated that he knew we were trying to help the people who had kidnapped [sic] him and taken him to Arkansas. Inmate McBride continued to yell, "I'm not going to let you put that poison in me anymore. You can't make me take it." Inmate McBride stated that he wasn't going to allow the nurse to administer any medical treatment should he need it. Inmate McBride stated that he was a trained pharmacist and knew that the Nurse was not going to giving [sic] him the right treatment.

Nurse Honeycutt then walked over to Inmate McBride and begin [sic] inserting the IV needle. Inmate McBride then began to spit at Nurse Honeycutt and Cpl Kembel. Inmate McBride attempted to bite Nurse Honeycutt in an attempt to get Nurse Honeycutt to stop. Inmate McBride started to bite on the left chest strap again. As the nurse got the IV needle into the vein in Inmate McBride's left hand, Inmate McBride attempted to pull his hand away by drawing his hand back toward his body placing pressure on the wrist restraints causing them to loosen. Cpl Kembel and I held Inmate McBride's left arm down against the arm of the restraint chair in an effort to assist the nurse with inserting the IV needle into a vein by keeping inmate McBride's hand still. Nurse Honeycutt was able to obtain a vein for IV use. As Nurse Honeycutt started to retrieve his medical tape, Inmate McBride again pulled his left arm toward his body in a short, fast motion, causing the IV needle to dislodge from Inmate McBride's vein. In doing this, Inmate McBride caused his hand to bleed, sending blood onto the left arm and side of the restraint chair.

15

Nurse Honeycutt told Inmate McBride that he would have to access the vein again. Nurse Honeycutt got another IV needle and once again made access to the vein in Inmate McBride's left hand. Inmate McBride was saying "I want your help. I will do anything you say just to be clean. I'll be good. Thank you for helping me."

One the IV was started, Inmate McBride began to place pressure on the wrist restraint by pulling his hand back toward his body. This would cause the IV to reverse its flow. This allowed blood to wash into the IV line. Inmate McBride had told me during the medical questioning that he had been exposed to hepatitis, although he was unsure which one, but hadn't been exposed to HIV. Inmate McBride told the Nurse while attempting to pull his left hand out of the restraint that he had other people load his syringes and he was not sure if the syringes had been used by other people or not. Inmate McBride continued to say that he did not want to be poisoned or be given meth. Inmate McBride continued to state that he knew we were trying to poison him. Inmate McBride also continued to yell, "you nigger loving bastards. You cocksuckers. You pig, bastards. You just want to kill me." Inmate McBride continued to try to pull both arms out of the wrist restraints. Inmate McBride would also rock the restraint chair from side to side in attempt to roll it over on its side. This act was unsafe for Inmate McBride and placing [sic] himself in danger of injury.

I again became concerned for Cpl Kembel, Nurse Honeycutt and my safety and the possibility of being exposed to a contagious disease so soon after an exposure to Hep C in April that I then retrieved the Taser. I placed the Taser against Inmate McBride's neck in attempt to get him to comply with not endangering himself by rolling the restraint chair onto its side and endangering us by pulling free from the restraints or causing the needle to become dislodged. Inmate McBride continued to struggle against the restraints in an attempt to get free from them, and rocking the chair from side to side. Inmate McBride continued to try to spit at and bite us. Inmate McBride never stopped yelling his ongoing accusations that we were trying to kill him, and that we were aiding the individuals that kidnapped [sic] him, or that we were "cocksucker [sic]; fat bastards, or nigger loving bastards." At approx. 0228 hrs., I engaged the Taser.

Plaintiff disputes this fact, denying that he was shocked with the taser due to his erratic, violent, or suicidal behavior, but admitting he was tasered on the neck while

16

strapped in a restraint chair, unable to move. Plaintiff cites page 52, line 11 through page

57, line 5, of David Honeycutt's deposition:

A:    I kept watching him right there real close. We had the IV in him. I was over at my counter, and when I turned around - - well, my counter was something like this, and he was - - he was more like about where that wall is, right there, to that area where I'm at. And all of a sudden, I heard something sizzling like bacon. They call it like bacon. As a matter of fact, I said that.

        And I turned my head, and Ms. Clark was tasering him in the neck, and she tasered him five or ten seconds. I don't know. I mean, I can't remember it, but it was a little bit of time. Enough time for me to hear it, turn my head and look, and still see the Taser connected to his neck.

Q:    Okay.

A.    In the neck area, you know. So that was - - you know if it had just been real quick, I wouldn't have heard it and I wouldn't have been able to turn and see it, but I actually saw it for a few seconds.

Q:    All right. Did you hear a ruckus or did you hear anything immediately prior to that?

A:    I didn't hear anything more than what had been going on for hours. Nothing different than what had been going on for some time.

Q:    All right. And when you turned to look, was Mr. McBride still in the restraint chair?

A:    Yes. He was strapped in.

Q:    Were his hands were - - I'm sorry. Were his wrists strapped down?

A:    Yes.

Q:    Were his shoulders strapped down?

A:    Yes.

17

Q:      Was he free to move around?

A:      No.

Q:      Okay.  Did you hear Deputy Clark say anything to Mr. McBride immediately prior to hearing the sizzling sounds?

A:      Well, Ms. Clark had been up at the - - there's a computer and a couple steps up, and she had been sitting there kind of watching. She'd come and go down there to him and up and back and forth, and she had been sitting up there.  And he had been just yelling and screaming and cussing, and so had Ms. Lockard.  And Ms. Clark had been yelling and screaming back at them, telling them to shut up, and she was just really - - she was really at that point worse than I had seen her in a while.  She was really upset.  She was to the point where she was just yelling back at him nonstop, making him shut up, because they - - you know, I was like okay, you know. They had been doing this for some time, and I can see how this would get on someone's nerves.  And a layperson, they would probably think, "Oh, my God.  I can't handle this."  But someone working in a jail, it's just, "So what," you know, because this happens.
        So she had been engaging in some pretty high-level verbal conversation with him for a while, both of them.

Q:      Okay.  Let's talk about the verbal conversations between she and Mr. McBride, right now.  Did she - - you said that they were yelling things back and forth.  Did she at any point threaten to use the Taser on him, on Mr. McBride?

A:      Yeah.  She showed it to him, too.  And he told her to go ahead and do it.  He said, "Go ahead and do it.  Shoot me, kill me, do whatever you want to do."  Yeah.  She showed it to him.

Q:      Do you recall any particular phrases or words that Deputy Clark used?

A:      She kept telling him if he didn't shut up, she was going to bring it over and use it, use this on him.  Now, I'm not sure if she used the word "Taser" or not.

18

Q:     Okay.  Did you say anything to her about the use of the Taser?

A:     No.  It wasn't my responsibility.  It wasn't my position to.  I mean, I - - no.  I had nothing to do with that.  I don't even know how to use it.

                                    .   .   .

Q:     Did it appear to you that the use of the Taser was for punishment?

                    Mr. Harpool:   Objection.  Calls for speculation.

Q:     Go ahead and answer, subject to the objection.

A:     Okay.  It appeared to me the use of the Taser was to keep him quiet.  And that's the best answer I can give you.

David Honeycutt's testimony describes the context in which Plaintiff was tasered. Because such testimony does not address why Plaintiff was placed in the restraint chair, the specific fact advanced in Defendant's averment, I find this fact to be uncontroverted.

     3.     **While Plaintiff was strapped in the restraint chair inside the confines of the Christian County Jail, Defendant Kim Clark held a taser to the neck of Plaintiff, shocking Plaintiff.**

     Defendant does not dispute this fact.

     **Defendant further avers that plaintiff was tasered in an effort to control him and restore order, based on his continued erratic, violent, and suicidal behavior.**

     Plaintiff disputes this fact.

     In support of this fact, Defendant cites the Incident Report, as set forth above in Additional Uncontroverted Fact No. 2.

19

In response, Plaintiff denies that he was shocked with the taser due to his erratic, violent, or suicidal behavior, but admits he was tasered on the neck while strapped in a restraint chair, unable to move. Plaintiff cites page 52, line 11 through page 57, line 5, of David Honeycutt's deposition:

A:      I kept watching him right there real close. We had the IV in him. I was over at my counter, and when I turned around - - well, my counter was something like this, and he was - - he was more like about where that wall is, right there, to that area where I'm at. And all of a sudden, I heard something sizzling like bacon. They call it like bacon. As a matter of fact, I said that.

And I turned my head, and Ms. Clark was tasering him in the neck, and she tasered him five or ten seconds. I don't know. I mean, I can't remember it, but it was a little bit of time. Enough time for me to hear it, turn my head and look, and still see the Taser connected to his neck.

Q:      Okay.

A.      In the neck area, you know. So that was - - you know if it had just been real quick, I wouldn't have heard it and I wouldn't have been able to turn and see it, but I actually saw it for a few seconds.

Q:      All right. Did you hear a ruckus or did you hear anything immediately prior to that?

A:      I didn't hear anything more than what had been going on for hours. Nothing different than what had been going on for some time.

Q:      All right. And when you turned to look, was Mr. McBride still in the restraint chair?

A:      Yes. He was strapped in.

Q:      Were his hands were - - I'm sorry. Were his wrists strapped down?

A:      Yes.

Q:      Were his shoulders strapped down?

A:      Yes.

Q:      Was he free to move around?

A:      No.

Q:      Okay. Did you hear Deputy Clark say anything to Mr. McBride immediately prior to hearing the sizzling sounds?

A:      Well, Ms. Clark had been up at the - - there's a computer and a couple steps up, and she had been sitting there kind of watching. She'd come and go down there to him and up and back and forth, and she had been sitting up there. And he had been just yelling and screaming and cussing, and so had Ms. Lockard. And Ms. Clark had been yelling and screaming back at them, telling them to shut up, and she was just really - - she was really at that point worse than I had seen her in a while. She was really upset. She was to the point where she was just yelling back at him nonstop, making him shut up, because they - - you know, I was like okay, you know. They had been doing this for some time, and I can see how this would get on someone's nerves. And a layperson, they would probably think, "Oh, my God. I can't handle this." But someone working in a jail, it's just, "So what," you know, because this happens.
        So she had been engaging in some pretty high-level verbal conversation with him for a while, both of them.

Q:      Okay. Let's talk about the verbal conversations between she and Mr. McBride, right now. Did she - - you said that they were yelling things back and forth. Did she at any point threaten to use the Taser on him, on Mr. McBride?

A:      Yeah. She showed it to him, too. And he told her to go ahead and do it. He said, "Go ahead and do it. Shoot me, kill me, do whatever you want to do." Yeah. She showed it to him.

Q:      Do you recall any particular phrases or words that Deputy Clark used?

21

A:      She kept telling him if he didn't shut up, she was going to bring it over and use it, use this on him.  Now, I'm not sure if she used the word "Taser" or not.

Q:      Okay.  Did you say anything to her about the use of the Taser?

A:      No.  It wasn't my responsibility.  It wasn't my position to.  I mean, I - - no.  I had nothing to do with that.  I don't even know how to use it.

                                      .   .   .

Q:      Did it appear to you that the use of the Taser was for punishment?

            Mr. Harpool:   Objection.  Calls for speculation.

Q:      Go ahead and answer, subject to the objection.

A:      Okay.  It appeared to me the use of the Taser was to keep him quiet.  And that's the best answer I can give you.

The testimony Plaintiff uses to controvert the additional averment describes the same series of events contained in Defendant's evidence.  Specifically, both accounts describe Plaintiff's erratic, loud and disruptive behavior.  The testimony offered by Plaintiff does not contain any evidence to controvert that he was violent and/or suicidal.  I, therefore, find that this fact is uncontroverted.

        4.      **Defendant Kim Clark was employed by the Christian County Sheriff's Department, and was working in her capacity as such an employee at the time she tasered Plaintiff.**

            Defendant does not dispute this fact.

        5.      **Defendant Kim Clark received training from the Christian**

**County Sheriff's Department, from Christian County employee Lt. Robert Shawley,**

**and thereby became certified in the use of tasers prior to tasering Plaintiff.**

Defendant does not dispute this fact.

6. **Plaintiff's loud behavior, in addition to her other job duties,**

**were creating stress for Defendant Kim Clark.**

Defendant does not dispute this fact.

7. **Defendant Kim Clark ordered Plaintiff to "shut up" several**

**times, but Plaintiff continued to be loud, immediately prior to Defendant Kim Clark**

**tasering Plaintiff on his neck.**

Defendant does not dispute the fact that David Honeycutt testified as such.

8. **Defendant Kim Clark tasered Plaintiff in an attempt to keep**

**him quiet.**

Defendant does not dispute the fact that Kim Clark tasered plaintiff, and

that plaintiff's loud behavior was interfering with her ability to perform her routine job

functions.

**Defendant specifically avers that Kim Clark's actions were intended**

**to gain control of a violent and suicidal inmate.**

In support of this statement, Defendant cites page 51, line 11 through page 52, line

6, of Kim Clark's deposition testimony:

Q:     All right.  What's the next thing that you remember happening with
        Kevin McBride?

23

A: He and Ms. Lockard began screaming and yelling back and forth again. I asked them to quiet down, I couldn't hear the people that I was booking in, their answers, and he was disrupting the other inmates that were trying to sleep. He started rocking the chair back and forth and again trying to pop the I.V. out. I told him to stop. He continued. I walked over with the TASER, placed it against the left side of his neck and engaged it.

Q: Okay. So at that point Mr. McBride and Holly Lockard were screaming and yelling at one another  - -

A: Yes.

Q:  - - is that correct? And it was interfering with your job duties?

A: Yes.

Q: Okay. And so to gain control of the situation and to, I guess, regain control of the situation, you used the TASER?

A: Yes.

She also cites the Incident Report, as described above in Additional

Uncontroverted Fact No. 2.

In response, Plaintiff denies that he was shocked with the taser due to his

erratic, violent, or suicidal behavior, but admits he was tasered on the neck while strapped

in a restraint chair, unable to move. He cites page 52, line 11 through page 57, line 5 of

David Honeycutt's deposition testimony:

A: I kept watching him right there real close. We had the IV in him. I was over at my counter, and when I turned around  - - well, my counter was something like this, and he was - - he was more like about where that wall is, right there, to that area where I'm at. And all of a sudden, I heard something sizzling like bacon. They call it like bacon. As a matter of fact, I said that.

24

And I turned my head, and Ms. Clark was tasering him in the neck, and she tasered him five or ten seconds. I don't know. I mean, I can't remember it, but it was a little bit of time. Enough time for me to hear it, turn my head and look, and still see the Taser connected to his neck.

Q:     Okay.

A.     In the neck area, you know. So that was - - you know if it had just been real quick, I wouldn't have heard it and I wouldn't have been able to turn and see it, but I actually saw it for a few seconds.

Q:     All right. Did you hear a ruckus or did you hear anything immediately prior to that?

A:     I didn't hear anything more than what had been going on for hours. Nothing different than what had been going on for some time.

Q:     All right. And when you turned to look, was Mr. McBride still in the restraint chair?

A:     Yes. He was strapped in.

Q:     Were his hands were - - I'm sorry. Were his wrists strapped down?

A:     Yes.

Q:     Were his shoulders strapped down?

A:     Yes.

Q:     Was he free to move around?

A:     No.

Q:     Okay. Did you hear Deputy Clark say anything to Mr. McBride immediately prior to hearing the sizzling sounds?

A:     Well, Ms. Clark had been up at the - - there's a computer and a couple steps up, and she had been sitting there kind of watching. She'd come and go down there to him and up and back and forth,

25

and she had been sitting up there. And he had been just yelling and screaming and cussing, and so had Ms. Lockard. And Ms. Clark had been yelling and screaming back at them, telling them to shut up, and she was just really - - she was really at that point worse than I had seen her in a while. She was really upset. She was to the point where she was just yelling back at him nonstop, making him shut up, because they - - you know, I was like okay, you know. They had been doing this for some time, and I can see how this would get on someone's nerves. And a layperson, they would probably think, "Oh, my God. I can't handle this." But someone working in a jail, it's just, "So what," you know, because this happens.

So she had been engaging in some pretty high-level verbal conversation with him for a while, both of them.

Q:     Okay. Let's talk about the verbal conversations between she and Mr. McBride, right now. Did she - - you said that they were yelling things back and forth. Did she at any point threaten to use the Taser on him, on Mr. McBride?

A:     Yeah. She showed it to him, too. And he told her to go ahead and do it. He said, "Go ahead and do it. Shoot me, kill me, do whatever you want to do." Yeah. She showed it to him.

Q:     Do you recall any particular phrases or words that Deputy Clark used?

A:     She kept telling him if he didn't shut up, she was going to bring it over and use it, use this on him. Now, I'm not sure if she used the word "Taser" or not.

Q:     Okay. Did you say anything to her about the use of the Taser?

A:     No. It wasn't my responsibility. It wasn't my position to. I mean, I - - no. I had nothing to do with that. I don't even know how to use it.

.   .   .

Q:     Did it appear to you that the use of the Taser was for punishment?

Mr. Harpool:   Objection. Calls for speculation.

26

Q:      Go ahead and answer, subject to the objection.

A:      Okay.  It appeared to me the use of the Taser was to keep him
        quiet.  And that's the best answer I can give you.

The testimony Plaintiff uses to controvert the additional averment describes the same series of events contained in Defendant's evidence.  Specifically, both accounts describe Plaintiff's erratic, loud and disruptive behavior.  The testimony offered by Plaintiff does not contain any evidence to controvert that he was violent and/or suicidal.  I, therefore, find that this fact is uncontroverted.

9.      **Defendant Kim Clark manually held a taser against the neck of Plaintiff while he was strapped in a restraint chair, and while Plaintiff was incapable of protecting himself.**

Defendant does not dispute this fact.

Defendant further avers that Kim Clark deployed the taser in conformity with her training and certification, and under circumstances in which use of that device was justified.

Plaintiff denies the taser was deployed in conformity with Defendant's training, but admits Plaintiff was tasered on the neck while strapped in a restraint chair, unable to move.

In support of this fact, Defendant cites page 68, line 6 through page 73, line 6 of Kim Clark's deposition testimony:

Q:      Okay.  Who trained - - who trained you with respect to the use of
        the TASER?

27

A:     Lieutenant Shawley.

Q:     When did you receive your training?

A:     February '03.

Q:     What was the - - excuse me.  What was the length of time of the training?  In other words, was it 45 minutes, two hours, three hours, two days?

A:     I don't recall how long it was.

Q:     Do you remember if it was one day or less?

A:     No, I don't.

Q:     How many people were trained along with you?

A:     The same time I was or a different class included?

Q:     The same time you were.

A:     I don't remember exactly.

Q:     Okay.  Do you know where Lieutenant Shawley got his training?

A:     No.

Q:     Do you know when Lieutenant Shawley became certified to use a TASER?

A:     No.

Q:     Do you know who certified Lieutenant Shawley to use a TASER?

A:     No.

Q:     How long has Lieutenant Shawley been with the Christian County Sheriff's Department?

A:     I don't know.

28

Q:      Do you recall where you received your training from Lieutenant Shawley?

A:      Christian County.

Q:      Okay.  Was it - - did you receive your training in the jail?

A:      No.

Q:      Okay.  Where were you?

A:      The main department.

Q:      Explain to me what you mean by the main department.

A:      The jail's separate from the offices of the department.

Q:      Okay.  And where are the offices of the department?

A:      On the north side of the building.

Q:      Okay.  And is that like a classroom setting?

A.      Yes.

Q:      Okay.  Do you recall when you were going through the training, were there other people going through the training besides you?

A:      Yes.

Q:      Okay.  Was he teaching more or less than three people?

A:      More.

Q:      Okay.  More or less than ten people?

A:      Less than ten.

Q:      Okay.  And did you receive your training during your normal shift?

A:      No.

29

Q:  Okay.  So you had to come I specially for this training?

A:  Yes.

Q:  Okay.  Did you get paid for that training?

A:  No.

Q:  Okay.  All right.  And you don't have any recollection as to the length or whether it was one day or two days or one week?

A:  No.

Q:  Okay.  Did Lieutenant Shawley have anyone from TASER company come and help you train at all?

A:  No.

Q:  So it was just Lieutenant Shawley that was training you?

A:  Yes.

Q:  Okay.  No one else was helping with the course?

A:  No.

Q:  Okay.  What do you recall with respect to the training?

A:  We had to pass a written test.

Q:  Okay.

A:  We had to be able to deploy it on a target properly.

Q:  And when you say "deploy it on a target," are we talking about being able to hit a target?

A:  Yes.

Q:  Okay.

30

A:     We had to be able to change out the batteries properly, test fire it for malfunctions, and receive a TASER shock ourselves.

Q:     Okay.  With respect to the training, if you are unable to hit the target, do you not pass or are you not certified?

A:     I don't know.

Q:     Okay.  How far away were you standing from the target?

A:     Approximately eight to ten feet.

Q:     And I assume you hit the target when you did your training?

A:     Yes.

Q:     How many times did you - - were you asked to try and hit the target?

A:     Once.

Q:     Okay.  All right.   And did you receive any training with respect to where to aim - -

A:     Yes.

Q:     - - at the target?  Where were you told to aim?

A:     Main body mass.

Q:     And when you say "main body mass," you're talking about the upper center chest area?

A:     Yes.

Q:     Okay.  All right.  What is it called when you shoot a TASER at someone?

A:     Deployment.

Q:    Okay.  What is it called when you use the TASER as a stun gun
      and physically put the TASER on someone?

A:    It can either be called a deployment or a stun drive.

Q:    Okay.  All right.  So you were trained, when you're using the
      TASER as a projectile, to aim for center mass?

A:    Yes.

Q:    Okay.  What were you trained to do with respect to when you use a
      TASER in a stun drive?

A:    Place it against the neck where it meets the shoulders or the under
      part of the thigh.

Q:    Where you given any explanation why to use those specific areas
      of the body?

A:    We were.  It had to do with the connection to the rest of the muscle
      groups.

Q:    Was that supposed to be more effective?

A:    Yes.

Defendant also cites the Christian County Sheriff's Department Jail Incident Report, as

set forth in support of Defendant's additional averment in Additional Uncontroverted

Fact No. 2 above.

Plaintiff disputes that the taser was deployed in conformity with

Defendant's training, but admits Plaintiff was tasered on the neck while strapped in a

restraint chair, unable to move.   He cites page 52, line 11 though page 57, line 5 of David

Honeycutt's deposition:

32

A:     I kept watching him right there real close. We had the IV in him. I was over at my counter, and when I turned around - - well, my counter was something like this, and he was - - he was more like about where that wall is, right there, to that area where I'm at. And all of a sudden, I heard something sizzling like bacon. They call it like bacon. As a matter of fact, I said that.

      And I turned my head, and Ms. Clark was tasering him in the neck, and she tasered him five or ten seconds. I don't know. I mean, I can't remember it, but it was a little bit of time. Enough time for me to hear it, turn my head and look, and still see the Taser connected to his neck.

Q:     Okay.

A.     In the neck area, you know. So that was - - you know if it had just been real quick, I wouldn't have heard it and I wouldn't have been able to turn and see it, but I actually saw it for a few seconds.

Q:     All right. Did you hear a ruckus or did you hear anything immediately prior to that?

A:     I didn't hear anything more than what had been going on for hours. Nothing different than what had been going on for some time.

Q:     All right. And when you turned to look, was Mr. McBride still in the restraint chair?

A:     Yes. He was strapped in.

Q:     Were his hands were - - I'm sorry. Were his wrists strapped down?

A:     Yes.

Q:     Were his shoulders strapped down?

A:     Yes.

Q:     Was he free to move around?

A:     No.

Q:      Okay.  Did you hear Deputy Clark say anything to Mr. McBride
        immediately prior to hearing the sizzling sounds?

A:      Well, Ms. Clark had been up at the - - there's a computer and a
        couple steps up, and she had been sitting there kind of watching.
        She'd come and go down there to him and up and back and forth,
        and she had been sitting up there.  And he had been just yelling and
        screaming and cussing, and so had Ms. Lockard.  And Ms. Clark
        had been yelling and screaming back at them, telling them to shut
        up, and she was just really - - she was really at that point worse
        than I had seen her in a while.  She was really upset.  She was to
        the point where she was just yelling back at him nonstop, making
        him shut up, because they - - you know, I was like okay, you know.
        They had been doing this for some time, and I can see how this
        would get on someone's nerves.  And a layperson, they would
        probably think, "Oh, my God.  I can't handle this."  But someone
        working in a jail, it's just, "So what," you know, because this
        happens.
                So she had been engaging in some pretty high-level
        verbal conversation with him for a while, both of them.

Q:      Okay.  Let's talk about the verbal conversations between she and
        Mr. McBride, right now.  Did she - - you said that they were
        yelling things back and forth.  Did she at any point threaten to use
        the Taser on him, on Mr. McBride?

A:      Yeah.  She showed it to him, too.  And he told her to go ahead and
        do it.  He said, "Go ahead and do it.  Shoot me, kill me, do
        whatever you want to do."  Yeah.  She showed it to him.

Q:      Do you recall any particular phrases or words that Deputy Clark
        used?

A:      She kept telling him if he didn't shut up, she was going to bring it
        over and use it, use this on him.  Now, I'm not sure if she used the
        word "Taser" or not.

Q:      Okay.  Did you say anything to her about the use of the Taser?

34

A:      No.  It wasn't my responsibility.  It wasn't my position to.  I mean, I - - no.  I had nothing to do with that.  I don't even know how to use it.

.   .   .

Q:      Did it appear to you that the use of the Taser was for punishment?

Mr. Harpool:   Objection.  Calls for speculation.

Q:      Go ahead and answer, subject to the objection.

A:       Okay.  It appeared to me the use of the Taser was to keep him quiet.  And that's the best answer I can give you.

Plaintiff also cites page 64, line 15 through page 66, line 24 of Kim Clark's deposition:

Q:      I'm going to show you what's been marked as Deposition Exhibit Clark 2.  Do you - - it's also Bate Stamp No. 47 of the request for production of documents.   Do you recognize that page?

A:      Yes, I do.

Q:      Okay.  What do you recognize this to be?

A:      My taser test portion of it.

Q:      A portion of it.  It's not the full test, though, right?

A.      No.

Q:      On No. 4 - - Question No. 4 of the test - - it's like a multiple choice question is how I would describe that.

A:      Um-hum.  Yes.

Q:      Do you recognize that?  The question says, "After deploying the advanced taser upon the threat," and then it gives a series of possible correct and incorrect responses.  What does that mean, "threat"?  It's in quotation marks or - - yeah, quotation marks.

A:      Threat is anything that we see as potential of injury.

35

Q:      Okay.  And so that's what it was discussed as in the course of your training?

A:      Yes.

Q:      Okay.  So that's what would constitute a threat in the course of your taser training at least?

A:      Not the complete thing.  There's a number of variables that constitute a threat.

Q:      Okay.  What are they?

A:      Are you - - are you in a potential [sic] dangerous situation.  Is the person that you're dealing with in a potentially dangerous situation. Is there a chance of the problem escalating further if you don't take immediate action now.  Is a bystander going to be injured or hurt.

Q:      And so those are the things that - - some of the factors you consider in whether or not there is a threat that would require the use of a taser?

A:      Yes.

Q:      Other than the training that was done at the sheriff's department, are you aware of any other meetings or training regarding tasers that have been held at the Christian County Sheriff's Department?

A:      No.

Q:      Other than the written policy on use of tasers by the Christian County Sheriff's Department, are you aware of any unwritten policies and procedures for their use?

A:      Until recently we have not had a written taser policy.  It was all verbal policy.

Q:      Okay.  At the time of this incident with Holly, what was your understanding of what the policy was in the Christian County jail?

36

A: Only use the amount of force necessary to gain control of the situation.

Q: What was your understanding about the use of specifically tasers in the jail at that time?

A: That it was - - on the use of force pendulum, it was at the same level as pepper spray or OC.

Q: Okay. And how was it that you came to - - to believe that?

A: That's what we were told during training.

The evidence referred to by the referred to by the respective parties speaks to different manners of conformance with Deputy Clark's training and certification. Defendant's evidence supports the proposition that Deputy Clark's actions conformed with her training and certification regarding the part of the body on which she should deploy the taser when using it in a stun drive, in that she deployed the taser on Plaintiff's neck. By contrast, Plaintiff's evidence speaks to conformity concerning whether Deputy Clark responded with the appropriate amount of force as instructed during training. I, therefore, find this fact to be controverted.

10. **Defendant Kim Clark's tasering of Plaintiff's neck while he was strapped in the Christian County Jail restraint chair resulting in physical injury and mild scarring to the neck of Plaintiff.**

Defendant does not dispute this fact.

37

Defendant further avers that such injuries are *de minimis*, and constitutionally insufficient to support an 8th Amendment claim, citing Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000).

In response, Plaintiff denies that the injuries he suffered are insufficient to support a claim of violation of his civil rights under the United States Constitution, but admits his flesh was burned with the taser resulting in small scars on his neck. He further states that the law holds that an Eighth Amendment claim does not require "significant injury," Berry v. Oswalt, 143 F.3d 1127 (8th Cir. 1998), and, in some instances, sufficient injury for excessive force claims - such as Plaintiff makes in this case - may result from the use of pepper spray, like in Jones v. Shields, cited by Defendant. Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002).

Here, Plaintiff had not been convicted of a crime, so the Eighth Amendment does not apply. See Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000); Putman v. Gerloff, 639 F.2d 415, 418-19 (8th Cir. 1981)(citing Bell v. Wolfish, 141 U.S. 520, 535 n.16 (1979)(quoting Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977)). Excessive force claims are compensable if an "actual injury" is sustained. Morris v. Crawford County, 173 F. Supp. 2d 870, 873 (W.D. Ark. 2001)(citing Howard v. Barnett, 21 F.3d 868, 872-73 (8th Cir. 1994)). In Morris, the court held that the bruises sustained as a result of a deputy's "blows" constituted an actual injury. Id. Under this analysis, the scars Plaintiff sustained from being tasered also constitute the requisite "actual injury." I find Defendant's additional averment to be controverted.

11.     **Christian County Jail nurse, David Honeycutt, testified that he believed the tasering of Plaintiff by Defendant Kim Clark was "to keep him quiet."**

Defendant does not dispute this fact.

**Defendant further avers that it was necessary for plaintiff to be quiet in order to gain control and restore order, as plaintiff's loud behavior was interfering with Kim Clark's ability to perform her job.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites page 51, line 11 through page 52, line 6, of Kim Clark's deposition:

Q:      All right.  What's the next thing that you remember happening with Kevin McBride?

A:      He and Ms. Lockard began screaming and yelling back and forth again.  I asked them to quiet down, I couldn't hear the people that I was booking in, their answers, and he was disrupting the other inmates that were trying to sleep.  He started rocking the chair back and forth and trying to pop the I.V. out.  I told him to stop.  He continued.  I walked over with the TASER, placed it against the left side of his neck and engaged it.

Q:      Okay.  So at that point Mr. McBride and Holly Lockard were screaming and yelling at one another - -

A:      Yes.

Q:      - - is that correct?  And it was interfering with your job duties?

A:      Yes.

Q:      Okay.  And so to gain control of the situation and to, I guess regain control over the situation, you used the TASER?

A:     Yes.

Plaintiff denies that it was necessary for Plaintiff to be quiet in order to gain control and restore order, or that Plaintiff was interfering with Defendant's ability to perform her job.  In support of this denial, he cites page 52, line 11 through page 57, line 5 of David Honeycutt's deposition:

A:     I kept watching him right there real close.  We had the IV in him.  I was over at my counter, and when I turned around  - - well, my counter was something like this, and he was - - he was more like about where that wall is, right there, to that area where I'm at.  And all of a sudden, I heard something sizzling like bacon.  They call it like bacon.  As a matter of fact, I said that.
        And I turned my head, and Ms. Clark was tasering him in the neck, and she tasered him five or ten seconds.  I don't know.  I mean, I can't remember it, but it was a little bit of time.  Enough time for me to hear it, turn my head and look, and still see the Taser connected to his neck.

A.     In the neck area, you know.  So that was - - you know if it had just been real quick, I wouldn't have heard it and I wouldn't have been able to turn and see it, but I actually saw it for a few seconds.

Q:     All right.  Did you hear a ruckus or did you hear anything immediately prior to that?

A:     I didn't hear anything more than what had been going on for hours.  Nothing different than what had been going on for some time.

Q:     All right.  And when you turned to look, was Mr. McBride still in the restraint chair?

A:     Yes.  He was strapped in.

Q:     Were his hands were - - I'm sorry.  Were his wrists strapped down?

A:     Yes.

40

Q:     Were his shoulders strapped down?

A:     Yes.

Q:     Was he free to move around?

A:     No.

Q:     Okay.  Did you hear Deputy Clark say anything to Mr. McBride immediately prior to hearing the sizzling sounds?

A:     Well, Ms. Clark had been up at the - - there's a computer and a couple steps up, and she had been sitting there kind of watching. She'd come and go down there to him and up and back and forth, and she had been sitting up there.  And he had been just yelling and screaming and cussing, and so had Ms. Lockard.  And Ms. Clark had been yelling and screaming back at them, telling them to shut up, and she was just really - - she was really at that point worse than I had seen her in a while.  She was really upset.  She was to the point where she was just yelling back at him nonstop, making him shut up, because they - - you know, I was like okay, you know. They had been doing this for some time, and I can see how this would get on someone's nerves.  And a layperson, they would probably think, "Oh, my God.  I can't handle this."  But someone working in a jail, it's just, "So what," you know, because this happens.
          So she had been engaging in some pretty high-level verbal conversation with him for a while, both of them.

Q:     Okay.  Let's talk about the verbal conversations between she and Mr. McBride, right now.  Did she - - you said that they were yelling things back and forth.  Did she at any point threaten to use the Taser on him, on Mr. McBride?

A:     Yeah.  She showed it to him, too.  And he told her to go ahead and do it.  He said, "Go ahead and do it.  Shoot me, kill me, do whatever you want to do."  Yeah.  She showed it to him.

Q:     Do you recall any particular phrases or words that Deputy Clark used?

41

A:  She kept telling him if he didn't shut up, she was going to bring it over and use it, use this on him.  Now, I'm not sure if she used the word "Taser" or not.

Q:  Okay.  Did you say anything to her about the use of the Taser?

A:  No.  It wasn't my responsibility.  It wasn't my position to.  I mean, I - - no.  I had nothing to do with that.  I don't even know how to use it.

.   .   .

Q:  Did it appear to you that the use of the Taser was for punishment?

Mr. Harpool:   Objection.  Calls for speculation.

Q:  Go ahead and answer, subject to the objection.

A:  Okay.  It appeared to me the use of the Taser was to keep him quiet.  And that's the best answer I can give you.

Plaintiff also cites page 64, line 15 through page 66, line 24 of Kim Clark's deposition:

Q:  I'm going to show you what's been marked as Deposition Exhibit Clark 2.  Do you - - it's also Bate Stamp No. 47 of the request for production of documents.   Do you recognize that page?

A:  Yes, I do.

Q:  Okay.  What do you recognize this to be?

A:  My taser test portion of it.

Q:  A portion of it.  It's not the full test, though, right?

A.  No.

Q:  On No. 4 - - Question No. 4 of the test - - it's like a multiple choice question is how I would describe that.

A:  Um-hum.  Yes.

42

Q:    Do you recognize that?  The question says, "After deploying the advanced taser upon the threat," and then it gives a series of possible correct and incorrect responses.  What does that mean, "threat"?  It's in quotation marks or - - yeah, quotation marks.

A:    Threat is anything that we see as potential of injury.

Q:    Okay.  And so that's what it was discussed as in the course of your training?

A:    Yes.

Q:    Okay.  So that's what would constitute a threat in the course of your taser training at least?

A:    Not the complete thing.  There's a number of variables that constitute a threat.

Q:    Okay.  What are they?

A:    Are you - - are you in a potential dangerous situation.  Is the person that you're dealing with in a potentially dangerous situation.  Is there a chance of the problem escalating further if you don't take immediate action now.  Is a bystander going to be injured or hurt.

Q:    And so those are the things that - - some of the factors you consider in whether or not there is a threat that would require the use of a taser?

A:    Yes.

Q:    Other than the training that was done at the sheriff's department, are you aware of any other meetings or training regarding tasers that have been held at the Christian County Sheriff's Department?

A:    No.

Q:    Other than the written policy on use of tasers by the Christian County Sheriff's Department, are you aware of any unwritten policies and procedures for their use?

43

A:     Until recently we have not had a written taser policy.  It was all
       verbal policy.

Q:     Okay.  At the time of this incident with Holly, what was your
       understanding of what the policy was in the Christian County jail?

A:     Only use the amount of force necessary to gain control of the
       situation.

Q:     What was your understanding about the use of specifically tasers in
       the jail at that time?

A:     That it was - - on the use of force pendulum, it was at the same
       level as pepper spray or OC.

Q:     Okay.  And how was it that you came to  - - to believe that?

A:     That's what we were told during training.

Deputy Clark's deposition testimony demonstrates that Plaintiff's yelling and screaming

was interfering with her ability to book new inmates and was disrupting the other inmates

who were trying to sleep.  The evidence referenced by Plaintiff does not dispute these

facts; instead, it merely confirms Plaintiff's loud and disruptive behavior.  I find this fact

to be uncontroverted.

## V.     EXCESSIVE FORCE

Plaintiff's § 1983 claim is against Defendant in both her individual and official

capacities.  Because different legal principles are involved, each will be addressed

separately.

### *Official Capacity*

Plaintiff's allegations against Defendant Clark in her official capacity are treated as allegations against Christian County.  See Dornheim v. Sholes, 430 F.3d 919, 926 (8th Cir. 2005)(stating that a suit against a government official in his or her official capacity is treated as a suit against the municipality he or she serves).  As a result, Plaintiff's claim of excessive force against Defendant Clark in her official capacity has already been resolved in my order granting Defendant Christian County's motion for summary judgment (Doc. # 78) and will not be set forth again here.

### *Individual Capacity*

Defendant argues that she is entitled to qualified immunity on Plaintiff's § 1983 claim.  A government official is protected from personal liability by qualified immunity unless "their alleged conduct violated 'clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known.'" McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The law is clearly established if it gives the defendant official 'fair warning' that his conduct violated an individual's rights when the official acted." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 739-40 (2002)).

In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-part analysis to be used in determining whether officials are entitled to qualified immunity.  First, a court must consider the threshold question of if, "[t]aken in a light most favorable to the party asserting the injury, . . . the facts alleged show the officer's

45

conduct violated a constitutional right. Id. If a constitutional right has not been violated, no further analysis is necessary. Id. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.

<i><b>Constitutional Violation</b></i>

The constitutional standard for a § 1983 excessive force claim differs depending of the status of the individual claiming a violation. Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001). If the victim is an arrestee, Fourth Amendment standards apply. Id. (citing Graham v. Connor, 490 U.S. 386, 388 (1989)); the Eighth Amendment protects convicted inmates against excessive force. Id. (citing Whitley v. Albers, 475 U.S. 312, 318-22 (1986)). "Between arrest and sentencing lies something of a legal twilight zone." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000). "The Supreme Court has left open the question of how to analyze a claim concerning the use of excessive force by law enforcement 'beyond the point at which arrest ends and pretrial detention begins.'" Id. The Eighth Circuit has not yet addressed this issue.

In this case, the parties disagree on the appropriate governing standard. That is, Plaintiff argues that the Fourth Amendment's objective reasonableness standard applies; Defendant contends that the Eighth Amendment governs Plaintiff's excessive force claim. It is clear that the Eighth Amendment does not apply, as Plaintiff had not yet been convicted of a crime and was not serving a sentence at the time of the alleged violation. See Wilson, 209 F.3d at 715 (stating that "the Eighth Amendment's ban on cruel and

46

unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences"). It is less clear, however, whether Plaintiff's claim is governed by the Fourth Amendment standard for arrestees or the Fourteenth Amendment standard for pretrial detainees.

Here, Plaintiff was being held on a warrant for suspicion of a drug-related offense. Although both parties categorize Plaintiff as a "pretrial detainee," merely labeling him as such does not make it so. Under factually analogous circumstances, courts of this circuit have applied - and the Eighth Circuit has upheld - the Fourth Amendment standard rather than the Fourteenth Amendment standard. See, e.g., Wilson, 209 F.3d at 715-16 (affirming application of Fourth Amendment standard to claim of excessive force that occurred after Plaintiff had been booked and while he was in a holding cell); Moore v. Novak, 146 F.3d 531, 535 (8th Cir. 1998)(affirming application of the Fourth Amendment standard to claim of excessive force when alleged violation took place during the booking process); Mayard v. Hopwood, 105 F.3d 1226, 1228 (8th Cir. 1997)(affirming application of Fourth Amendment standard to claim of excessive force that occurred after Plaintiff had been arrested and was being transported to police headquarters). As a result, I find that the Fourth Amendment governs Plaintiff's excessive force claim.

To prevail on a claim of excessive force under the Fourth Amendment, a Plaintiff must establish that the amount of force used was not objectively reasonable under the

47

particular circumstances.  Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994); Moore, 146 F.3d at 535.  "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct."  Moore, 146 F.3d at 535 (citing Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990)).

In this case, the undisputed facts are that Plaintiff was yelling vulgarities while in the Christian County Jail.  His yelling and screaming was both disrupting and upsetting other inmates and interfering with Defendant's ability to do her job.  Additionally, Plaintiff bit the straps of his safety suit until successful in removing the suit, which Defendant interpreted as an attempt to escape.  After being placed in the restraint chair, Plaintiff continued to yell and scream.  He also dislodged his IV and caused himself to bleed, all after having informed Defendant that he had Hepatitis C.  Moreover, Plaintiff does not dispute that Defendant deployed the taser for Plaintiff's safety, officer safety in preventing the spread of communicable disease(s), to maintain control of the jail population, and to gain Plaintiff's compliance with verbal commands.  Because, under these circumstances, Defendant was objectively reasonably in applying force, summary judgment will be granted.[4]

_____

[4]I note that even under the Fourteenth Amendment standard, the result would have been the same.  In order for a pretrial detainee to prevail on an excessive force claim, he or she must prove that the force was applied for the purpose of punishment rather than as "an incident of some other legitimate governmental purpose."  Putman, 639 F.2d at 419.

48

## VI.    BATTERY

Plaintiff's battery claim is also against Defendant both individually and in her official capacity.  Because different legal principles are involved, each will be addressed in turn.

### *Individual Capacity*

"The official immunity doctrine provides that public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions."  DaVee v. Mathis, 812 S.W.2d 816, 827 (Mo. App. 1991)(quoting Kanagawa v. State, 685 S.W.2d 831, 835 (Mo. banc 1985)); see also Seiner v. Drenon, 304 F.3d 810, 813 (8th Cir. 2002)(applying Missouri law); Deuser v. King, 24 S.W.3d 25, 254 (Mo. App. 2000)(citing Green v. Denison, 738 S.W.2d 861, 865 (Mo. banc 1987)). If the conduct involves ministerial acts, however, the official is not entitled to immunity. Bachmann v. Welby, 860 S.W.2d 31, 33 (Mo. App. 1993).  Discretionary acts are those that require "the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or a course pursued."  Deuser, 24 S.W.3d at 254 (citing Rustici v. Weidemeyer, 673 S.W.2d 762, 769 (Mo. banc 1984)). By contrast, ministerial acts are "'of a clerical nature which a public officer is required to

---

"[S]teps to maintain security and order" has been held to be a legitimate governmental objective.  Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979)).  Under this framework, Defendant would still be entitled to summary judgment as the undisputed facts show that she deployed the taser for Plaintiff's safety, officer safety in preventing the spread of communicable disease(s), to maintain control of the jail population, and to gain Plaintiff's compliance with verbal commands.

49

perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to [the officer's] own judgment or opinion concerning the propriety of the act to be performed.'" Bachmann, 860 S.W.2d at 33 (quoting Jackson v. Wilson, 581 S.W.2d 39, 43 (Mo. App. 1979)).

Under Missouri law, the drawing and firing of a weapon is a discretionary function. See, e.g., Seiner, 304 F.3d at 813; Murray v. Leyshock, 915 F.2d 1196, 1200 (8th Cir. 1990)(applying Missouri law); Miller v. Smith, 921 S.W.2d 39, 46 (Mo. App. 1996); Bachmann, 860 S.W.2d at 33. Much like drawing and firing a firearm, the decision to deploy a taser is also a discretionary function. Deployment of a taser is not a clerical act to be performed within a prescribed manner. To the contrary, an officer uses his or her professional judgment and discretion to determine when use of a taser is appropriate and necessary. Although he or she may be guided by the general parameters of a taser policy, by its very nature, such a policy cannot mandate each and every circumstance in which a taser should or should not be deployed. Deputy Clark is, therefore, entitled to official immunity in her individual capacity and her motion for summary judgment on Count II is granted.

### *Official Capacity*

A suit against a government official in his or her official capacity is treated as a suit against the municipality he or she serves. Dornheim, 430 F.3d at 926; see also Gordon v. City of Kansas City, No. 98-0951-CV-W-4, 1999 WL 33453793, at *5 n.3 (W.D. Mo. Nov. 2, 1999)(stating that claims asserted against "the City and the individual

50

defendants in their official capacity, are barred by sovereign immunity under Mo.Ann.Stat. § 537.600"). Public entities are generally shielded by sovereign immunity from liability for common law tort claims. See Mo. Rev. Stat. § 537.600. "Intentional torts have consistently been found to fall within the shield of sovereign immunity." Mitchell v. Village of Edmundson, 891 S.W.2d 848, 850 (Mo. App. 1995); see also Carmelo v. Miller, 569 S.W.2d 365, 367-68 (Mo. App. 1978)(holding sovereign immunity applied to a claim for assault and battery).

Here, Plaintiff's battery claim against Deputy Clark in her official capacity is essentially a battery claim against Christian County, the municipality for whom she works. Although Defendants' Joint Answer to Plaintiff's Complaint includes the affirmative defense of sovereign immunity (Doc. # 9, ¶ 1), neither Defendant Clark nor Defendant Christian County's motion for summary judgment addresses this issue. Defendant Christian County, therefore, has until Monday, March 20, 2006, to brief whether it is entitled to summary judgment on this claim based on sovereign immunity. Plaintiff shall respond no later than March 31, 2006.

## VII.    CONCLUSION

Based on the above findings of undisputed facts and the law as discussed in section V, I find that there remain no genuine issues of material fact, that Defendant's actions did not constitute excessive force, and that Defendant is entitled to summary judgment on this ground. Furthermore, based on the findings of undisputed facts and the

51

law as discussed in section VI, I find that there remain no issues of material fact and that Defendant is entitled to summary judgment only in her individual capacity on Plaintiff's battery claim.

Therefore, it is

ORDERED that Defendant's Motion for Summary Judgment is granted.

_/s/ Robert E. Larsen_
_____ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 8, 2006